(No. 20681.—

HERBERT M. WARREN *et al.* Appellants, *vs.* IDA PFEIL, *et al.* Appellees.

*Opinion filed December 17, 1931.*

FRANK J. JONES, for appellants.

LAGGER & BLATT, for appellees.

Mr. JUSTICE DUNCAN delivered the opinion of the court:

This is an appeal from a decree of the circuit court of Will county dismissing for want of equity appellants' bill of complaint to set aside a deed from Eliza F. Sampson, deceased, to appellee Ida Pfeil, purporting to convey about 106 acres of real estate in said county. Appellant Herbert M. Warren is named in the will of Eliza F. Sampson, which was admitted to probate after her death, as the devisee of the 106 acres of land conveyed by the deed, and the other appellants are Fred J. Oliver and Robert Oliver,

nephews of the deceased, and W. H. Harvey, the conservator of Roxanna Oliver, insane, a niece of the deceased, the nephews and niece being the next of kin and only heirs of the deceased.

The bill of complaint was filed December 24, 1929, and charged that Eliza F. Sampson died on May 5, 1929; that the deed from her to Ida Pfeil for the 106 acres of land was executed on March 15, 1929; that the deed was executed without consideration and by reason of undue influence exercised by the grantee on the grantor; that the grantor at the time of executing the deed was of unsound mind, and that at the time of the execution of the deed there was a confidential relationship existing between the grantee and the grantor. Ida Pfeil, Henry Pfeil, her husband, and Paul M. Collins, executor of the last will of the deceased, were made defendants. Ida Pfeil and her husband filed an answer denying the allegations of undue influence, of mental incapacity of the grantor and of a confidential relationship between the grantor and the grantee, and alleged that the deed was executed as compensation for kindness shown by the grantee to the grantor. The evidence was heard by the chancellor, who entered a decree dismissing the bill for want of equity.

In 1865 the Sampson family moved onto a farm about six miles north and west of the village of Peotone, in Will county. After the death of their parents, Eliza Sampson, the grantor, a spinster, and her brother, William Sampson, a bachelor, lived together on this farm until William's death, December 11, 1928. Eliza had been in poor health for several years prior to the date of her death, May 5, 1929. She had had Potts' disease—a tubercular condition of the spine—for perhaps fifty years. She was a hunchback. For several years prior to William's death the farm land owned by the Sampsons had been leased to tenants, and Herbert M. Warren had been lessee of the 106 acres in question for about ten years. In March, 1928, Eliza had an attack

of influenza and was thereafter an invalid, under medical care and the attendance of nurses. On October 11, 1928, she and William executed their respective wills, which had been drawn by Paul M. Collins, an attorney and banker of Peotone, who had acted as attorney for the Sampson family for many years. On December 8, 1928, Eliza appointed David H. Morrison, a neighbor and trusted friend, her business agent, and he thereafter paid all her bills by checks drawn on a bank account that he opened in his name as her agent. William died on December 11, 1928, after a short illness. Ida Pfeil, who lived in Peotone, was employed to act as a nurse at the Sampson home some time in November or December, 1928, during William's illness. Prior to that time Eliza had no acquaintance with her. On December 19, 1928, Eliza was moved to Mrs. Pfeil's home in Peotone and remained there under Mrs. Pfeil's care until her death, May 5, 1929. Beside Potts' disease she had Bright's disease and a malady of the heart—myocarditis. This latter disease was the direct cause of her death. Mrs. Pfeil was paid by checks drawn by Morrison as agent for Eliza, $1044.50 for her services after Eliza was moved to Mrs. Pfeil's home. By the will of William he bequeathed and devised all of his property to Eliza, provided she should survive him. This will was admitted to probate after his death. By Eliza's will of October 11, 1928, she devised all of her real estate except the 106 acres in question to William, provided he survived her. The 106 acres she devised to William for life and at his death to Herbert M. Warren. The will provided that should she survive William the 106 acres should go to Warren immediately on her death; that the other real estate be sold and certain bequests paid, among them one of $500 to Alice Barton, a nurse who had attended her, and that the remainder of her estate should go to her niece and nephews above named. On January 29, 1929, Eliza executed a codicil to her will, by which she revoked the bequest

of $500 to Miss Barton and made a bequest of $500 to James W. Turner, the physician who was attending her, to be paid to his son, Vernon, when he became twenty-one years of age, and also made a bequest of $500 to Mrs. Pfeil. On March 11, 1929, Eliza executed a second codicil by which she revoked the provision of the original will leaving the residuary estate to her niece and nephews and provided that the residuary estate should go to Mrs. Pfeil "in consideration of the unusual and kindly care she is giving me at this time and provided she cares for me until the date of my death." These two codicils were drawn by Eliza's attorney, Paul M. Collins, and were executed in his presence at Mrs. Pfeil's home. The deed from Eliza to Mrs. Pfeil for the 106 acres of land was drawn by Henry R. Eisenbrandt, cashier of the Peotone State Bank, and executed by Eliza on March 15, 1929, at Mrs. Pfeil's home, in the presence of Eisenbrandt and Fred C. Jurres, also an officer of the Peotone State Bank. The acknowledgment was taken by Eisenbrandt, as notary public. Eliza directed that the deed be kept by Eisenbrandt until her death and then delivered to the grantee, and this was done. Eliza's original will bore her signature but both codicils and the deed were signed by mark. The original will and codicil of January 29, 1929, were admitted to probate by the probate court of Will county. That court refused probate of the codicil of March 11, but on appeal the circuit court ordered that it be admitted to probate. It appears from the evidence that the value of the 106 acres of land is about $12,000 and that the residuary estate of Eliza amounts to about $30,000 in value.

David H. Morrison, a witness for appellants, testified in substance as follows: He was a neighbor and trusted friend of the Sampsons for many years. He was executor of William's will. Herbert M. Warren, a brother-in-law of witness, had lived on the 106 acres for ten years or more as tenant and during that time supplied the Sampsons

with milk and butter and did chores and errands for them. He sat up at the Sampson home during William's illness. Eliza Sampson was friendly with him and his wife. He acted as her business agent after December 8, 1928. He talked to Mrs. Pfeil on December 17 or 18, 1928, and said to her that Mrs. Caliouette (a nurse that had formerly attended Eliza) would be back in about two weeks and would take care of her. Mrs. Pfeil replied, "I will be damned if she is going to get this job. When she goes to town I am going to take care of her." He saw Eliza at the Pfeil home in Peotone at least once a week between December 19, 1928, and May 5, 1929, but never had a private talk with her because Mrs. Pfeil was always in the room, except one time when her daughter was present. Eliza was gradually failing all the time and was weaker in March than in January. She did not talk much although she had formerly been a talkative woman. Often when he asked her if she wanted anything Mrs. Pfeil would answer for her. Eliza's attitude towards witness became cooler and more unfriendly all the time. On March 12, 1929, he received a letter from Dr. Turner requesting pay for his services as Eliza's physician, and there was not enough money in the bank account to pay the bill. Witness talked to Collins, his attorney, and it was arranged to transfer $1000 from the William Sampson estate to Eliza's account. He took a receipt for the $1000 to the Pfeil home for Eliza's signature. Eliza did not seem to understand what the receipt was for and was disinclined to sign it. Mrs. Pfeil told her that it was all right and asked her to sign it, and after the request had been repeated three times she signed the receipt. Her condition was such that witness had Mrs. Pfeil sign the receipt as a witness. Eliza was physically in very poor condition and was weak. After March 12 witness had no business transactions with her in which she signed any papers. She never told him about making the deed to Mrs. Pfeil and he did not know of the

deed having been executed until after her death. In April, 1929, he received a letter from Mrs. Pfeil in which she said, "Aunt Eliza would like to have you send a check for $25, as she wants some money." He sent the check. The next time he called on Eliza Mrs. Pfeil gave the check back to him, saying that Eliza needed no money, and that the biggest trouble she had with her was that she always wanted to give every child that came into the house a nickel or a dime. Several times when he visited Eliza she went to sleep while he was there.

Paul M. Collins, a witness for appellants, had been president of the Citizens' State Bank of Peotone, with which Eliza and William Sampson did business, and had also been attorney for the Sampson family for many years. He testified in substance as follows: He prepared three wills for William, including the last one. He wrote two wills and two codicils for Eliza and was present at the execution of each one. When she and William executed their wills in October, 1928, Eliza and William both talked quite a bit about their property and the reasons for the provisions of the wills. After Eliza was moved to Mrs. Pfeil's home she never at any time discussed any personal matters with witness. He went to see her on January 28, 1929, at Mrs. Pfeil's home at the request of Dr. Turner. Eliza told him she wanted to change her will by canceling the bequest of $500 to Miss Barton and giving $500 to Mrs. Pfeil and $500 to Dr. Turner for his son. He prepared a codicil to the will and the next day it was executed by Eliza in his presence and in the presence of his son, John Collins, and E. P. Cowing, who signed as witnesses. He next saw her on March 10, 1929, when he called on her at Mrs. Pfeil's request. Eliza, after Mrs. Pfeil had left the room, said to him, "I want to give everything to nurse." By "nurse" she referred to Mrs. Pfeil. He reminded her that she had property of considerable value and that by her codicil of January 29 she had bequeathed $500 to Mrs. Pfeil, and she

again said, "I want to give everything to nurse." He reminded her that it had been William's desire, as well as hers, that the 106 acres should go to Herbert M. Warren, and asked her if she thought it would be right not to leave the 106 acres to him. She then said, "Well, leave the Warren farm out." Witness prepared the second codicil to the will, and the next day it was executed by Eliza in his presence and the presence of John Collins and E. P. Cowing at Mrs. Pfeil's home. When they came to Mrs. Pfeil's home on March 11, 1929, Mrs. Pfeil was dressing Eliza's feet. When she had finished she put Eliza in a reclining chair. He started to explain to Eliza the contents of the codicil, and she interrupted by asking if she had enough money to keep her and if she could put a mortgage on her farm. He assured her that she had enough money for her needs and that it would be unnecessary for her to make a mortgage. She then said something about some Wilmington bonds. She said she could not sign the codicil, and he had her touch the pen while he wrote her name. She was much weaker in March than she had been in the preceding January and October. The difference between her condition in March and in October was very marked. In March she was "just a little, old, weakened-up, sick woman."

John B. Collins and Edwin P. Cowing, who were witnesses to the original will and the two codicils executed by Eliza, testified for appellants. They both stated that in October, when Eliza and William executed their wills, Eliza greeted them by name and asked them some questions. She showed an interest in the provisions of the wills and she and William talked considerably about the disposition of their property. When the first codicil was executed, in January, 1929, she sat in a reclining chair. She greeted them with a nod. She did not talk much. In March they did not remember her even nodding to them. On that occasion she was reclining in a Morris chair. She interrupted Paul Collins when he was reading and explaining

the codicil to her by questions about bonds, whether she had enough money to keep her and about executing a mortgage. She showed little interest in the provisions of the codicil. She merely nodded when Paul Collins asked her if the codicil expressed her will and if she wanted them to sign as witnesses. John Collins said she was much thinner in March than in the previous October but that he noted little difference in her condition in March and in January. Cowing stated that she seemed weaker in March than in January.

William Pooley, a witness for appellants, testified in substance as follows: In February, 1929, he moved into the farmhouse formerly occupied by the Sampsons. When he moved there was a stove in the house, which Eliza said he might have as a gift. Some time later he got a letter from Mrs. Pfeil asking him to pay $25 for the stove. He went to see Eliza at Mrs. Pfeil's home and asked her what she wanted for the stove, and she replied that she had given it to him. Mrs. Pfeil then said, "You know, Aunt Eliza, you gave me that stuff out there."

Other evidence for appellants shows that prior to William's death Herbert M. Warren did many acts of kindness for the Sampsons and that both Eliza and William held him in high regard. There is also evidence that after William's death Mrs. Pfeil expressed a desire to have Eliza brought to her home in Peotone if she could secure her husband's consent and Dr. Turner would approve of the idea, and that Eliza wanted to be moved to Peotone but wanted to move into a house there that had been owned by William at the time of his death. Several witnesses for appellants testified to visits that they had made to Eliza while she was in Mrs. Pfeil's home. They told of the fact that Eliza had been a talkative woman but was so weak while at Mrs. Pfeil's home that she talked little and would sometimes drop off to sleep during a conversation. These witnesses also mentioned the fact that Mrs. Pfeil was practically always in the room with them when they visited Eliza, but

stated that they had no occasion to talk to Eliza privately and never requested Mrs. Pfeil to leave the room. Robert and Fred J. Oliver, nephews of Eliza, told of visiting her on March 13, 1929, in response to a telephone call from Mrs. Pfeil in which she stated that Eliza was "very low." They stated that on that visit Eliza did not recognize them and appeared to be in a very serious physical condition. Warren told of calling on Eliza on March 18 and April 2, 1929, and stated that on the first of those two visits Mrs. Pfeil told him not to disturb Eliza "as she was awfully low," and that on both those visits Eliza lay on the bed with her face to the wall, moaning, and did not look up or speak. He also stated that one time in January, when he called on her at Mrs. Pfeil's home, Mrs. Pfeil stepped out of the room for just a minute, and Eliza leaned over and in a whisper asked him if he still had William's watch, and when he replied that he did, she told him to keep it; that she also mentioned the farm, and said, "Don't let anybody get it away from you." He further testified that on April 2, as he was driving past the Peotone town hall in his automobile on his way to Mrs. Pfeil's home to visit Eliza, he saw Mrs. Pfeil going into the town hall; that he drove on to her home, a distance of five or six blocks, and had been in the house not more than a minute talking to Mrs. Pfeil's daughter, when Mrs. Pfeil came into the house, "puffing and blowing," and said to him: "You damn fool, why didn't you stop when I hollered at you? I was just going to vote when you passed the town hall;" that he replied that he had not heard her, and she then said that she had forgotten to take a check that she wanted to get cashed, and that she stayed at the house until he left and then went out with him.

Dr. J. W. Turner, a witness for appellees, testified in substance as follows: He had been family physician of the Sampsons for thirteen years before Eliza's death. He treated her from the time she had influenza, in March, 1928,

until her death. He attended William during his last illness. Eliza had Potts' disease for many years prior to her death. Potts' disease does not impair the mental faculties. She also had Bright's disease for several months before her death. That disease did not affect her mentality. She had no uremic poisoning. She also had myocarditis, which disease caused her death. A person who dies of myocarditis dies of sheer weakness—the heart muscles give way. Prior to the time of her removal from the farm to Peotone she talked to witness about her property and her relatives. She told him several times that she was going to give Herbert Warren the farm he was living on. She spoke very well of Warren. She also told a witness that the Olivers expected to get something from her but that they would not get one cent. During William's last illness a Mrs. Caliouette was acting as nurse at the Sampson home and later Mrs. Pfeil was also employed as a nurse. After William's death there was a discussion among witnesses, the Oliver boys, Warren, Mrs. Caliouette and Mrs. Pfeil as to what they would do with Eliza. Eliza had said she would not go to a hospital. Robert Oliver said he could not take her in his home. Warren said that he could not take her, as he did not have room. Mrs. Pfeil then suggested that she would take her into her home provided her husband consented, and that she could stay there until she could move into her own house in Peotone. After Eliza was moved to Mrs. Pfeil's home witness saw her almost every day until her death. When he called on her he examined her and talked with her about the happenings in the village, about his son in school, and other things. She took part in the conversation and her talk was connected and rational. He noted no impairment of her mental faculties until four or five days before her death. He observed nothing during March, 1929, that in any way suggested to him any impairment of her mental faculties. Her physical condition in March, 1929, was about the same as it had been previously. At

no time during that month was she in such a condition as to suggest danger of her immediate death. In his opinion her mind was sound on March 15, 1929, and she knew what property she owned and was able to understand the effect of a conveyance to a third person. She never became drowsy or fell asleep while he was talking with her. Mrs. Pfeil told him about Eliza's having executed the second codicil to her will. She said that Eliza had left the balance of her property to her (Mrs. Pfeil) except the Warren farm and that there would be nothing done about the Warren farm. He did not think Mrs. Pfeil stated that she had gotten all the property except the Warren farm but could not budge Eliza on that. He stated that he thought that he made a statement to appellants' attorney in which he stated that about two days after March 11, 1929, Mrs. Pfeil followed him onto the porch of her home and made a statement that he thought strange; that she said, "I guess there is no chance of us getting that Warren farm; that seems to be tied up." He said he did not remember whether or not in January, 1929, in the room occupied by Eliza in Mrs. Pfeil's home, either he or Mrs. Pfeil suggested to Eliza that Miss Barton did not need the $500 that had been bequeathed to her and suggested that amount should be given to him and Mrs. Pfeil.

John Hoerner, a witness for appellees and a minister, testified that he called on Eliza twice in January, 1929, and also on April 12, 1929; that on those occasions he talked to her and she to him; that her conversation was connected and rational and that he observed nothing that caused doubt as to her mental faculties; that she seemed to be sound in mind and memory, and that she particularly spoke of the good care Mrs. Pfeil was giving her.

Victoria Caliouette, a witness for appellees, testified in substance as follows: She had been a practical nurse for eighteen years and was nurse for Eliza before William's death. She quit nursing at the Sampson home on the date

of William's funeral because of the illness of her son. While she was a nurse in the Sampson home she heard Eliza talk about the Olivers. Eliza did not like them and said she would not leave one cent to them. When the Olivers came to visit her she "carried on awful; she was always worse when they were there." She told witness to keep the Olivers in the kitchen—that she did not want to see them. Witness was present, on the day of William's death, at a discussion of what should be done with Eliza. Herbert M. Warren stated that he had no room and could not take her. Neither of the Oliver boys would take her, and then Mrs. Pfeil volunteered to take her into her home. Witness visited Eliza three times after she was moved to Mrs. Pfeil's home. The first visit was on January 4, the second in the first part of March, and the last on April 23, 1929. On each of these visits she held conversations with Eliza and she seemed perfectly rational. On either the first or second visit Eliza did not talk much because she had a coughing spell, during which she "coughed two solid hours." After Eliza had executed the first codicil to her will Mrs. Pfeil told witness that Eliza had revoked the bequest of $500 to Miss Barton and that she thought the $500 had been divided between her and witness.

Henry R. Eisenbrandt, a witness for appellees, testified in substance as follows: He has been cashier of the Peotone State Bank since 1916. Eliza never did any business at his bank and the only document he ever prepared for her was the deed in question. Prior to March, 1929, he had not seen her for several years. Mrs. Pfeil did what little banking business she had at witness' bank. About a week before the deed was executed he received a telephone call stating that Eliza wanted to see him. The message came in a woman's voice but he did not know who did the talking. In response to that call he went to see Eliza at Mrs. Pfeil's home. She was sitting in a chair. She stated that she wanted to talk about some business matters, and

said, "They tell me I cannot change my will." He told her that maybe her brother's death made a difference, and that he was going to Joliet and while there would investigate and report to her. He went to Joliet and while there looked at the records, and that same day went to see Eliza again and told her that she could dispose of her property as she desired. She thanked him and told him that she might call for him later. Mrs. Pfeil was not in the room with Eliza at either time when he talked to her on that day. On March 15, 1929, he received another telephone call asking him to call on Eliza. He went to see her and talked with her in Mrs. Pfeil's presence. She told him that she had changed her will so as to give some of her property to Mrs. Pfeil, who was taking good care of her and deserved it, and stated that she now wanted to give Mrs. Pfeil the 106 acres of land but wanted it fixed so that everybody would not know about it. He told her that she could make a deed and deliver it to a third person to be delivered to the grantee after her death and that such delivery would be good. She then told him to prepare the deed. He stated that he would go back to the bank, prepare the deed and call again. After banking hours that afternoon he drafted a deed for the 106 acres from Eliza to Mrs. Pfeil, and that evening about seven o'clock, with Fred C. Jurres, whom he took with him, he again called on Eliza. Mrs. Pfeil showed them in but was not in the room with Eliza until after the deed was executed. Eliza was sitting in a chair. He told her that he had prepared the deed and asked her if she wanted him to read it to her. She said that she preferred to read it herself and took it and read it. He asked her if it was what she wanted, and she said, "Yes." She asked him to sign her name to the deed. He did so and she then made her mark. Jurres and witness then signed as witnesses, and he, as notary public, took the acknowledgment. He handed the deed to her and she handed it back to him and told him to give it to Mrs. Pfeil after her

(Eliza's) death. He signed and gave her a receipt for the deed, a duplicate of which was introduced in evidence. In his opinion she knew and understood the business in which she was engaged. After her death he went with Mrs. Pfeil to Joliet, where they left the deed to be recorded.

Fred C. Jurres testified concerning the execution of the deed and his testimony in that respect is not materially different from that of Eisenbrandt. He further testified that after the deed was executed he and Eisenbrandt visited for a few minutes with Eliza, and she asked witness about his mother, and mentioned the fact that she (Eliza) used to visit his mother when she was sick. This witness gave it as his opinion that Eliza knew what she was doing when she signed the deed, was of sound mind and memory, and understood the nature, character and effect of the transaction in which she was engaged.

In rebuttal Paul M. Collins and David H. Morrison testified for appellants, over objection of appellees, as follows: The former stated that in January, 1929, Dr. Turner called on him and asked him to go to Mrs. Pfeil's home to see Eliza, who wanted to change her will; that on the second day thereafter, he not yet having gone to see Eliza, Dr. Turner called again and said, "You had better go down there because I don't think she will live long, and it will be the means of cutting my boy out of that money." Morrison stated that on March 12, 1929, he had a conversation with Dr. Turner in which he (Dr. Turner) said that he would like to have Eliza's bill settled, because she was in bad shape and he did not think she "would last much longer;" that later the same day he saw Dr. Turner again and paid the bill; that Dr. Turner thanked him and said that Mrs. Pfeil had followed him out onto the porch the previous night and said to him that "they had everything fixed but the Warren place and that all hell couldn't move her on that."

The foregoing is the substance of all the evidence in this case. Appellants do not contend in this court that the grantor did not have sufficient mental ability to make a deed when the deed in question was executed but do contend that the evidence shows that the deed was executed because of the undue influence of the grantee, and that there was a confidential relationship between the grantor and the grantee, so that the grantee had the burden of proving the absence of undue influence.

Since the issue in this case is almost wholly one of fact the problem is to make proper deductions from the facts shown by the evidence. The situation presented by the evidence may be summarized as follows: From March, 1928, until her death on May 5, 1929, Eliza, the grantor, was an invalid under treatment by a physician and had the constant attendance of nurses, and her physical strength and mental ability suffered a gradual decline during that period of illness. In October, 1928, she and her brother executed their respective wills, and in the will of the grantor a devise of the land in question was made to Herbert M. Warren. Warren had been a friend of the grantor and her brother for many years and had shown them many acts of kindness and consideration, for which they were grateful, and the devise to him was considered a gift from Eliza and her brother jointly to him, made because of the consideration and kind attention that he had shown them. Until November, 1928, the grantee in the deed, Ida Pfeil, was a stranger to both Eliza and her brother. She came to their home as a nurse. After the brother's death she conceived the idea of taking Eliza to her home, and it was at her suggestion that she was moved there on December 19, 1928. Prior to this time, because of her condition, Eliza had appointed David H. Morrison her agent to look after her business for her. While she was at Mrs. Pfeil's home she was visited by her friends and relatives, but they at no time had the opportunity to talk to her alone. She had been at Mrs.

Pfeil's home for only one month and ten days when she executed a codicil to her will revoking a bequest of $500 to Alice Barton, a nurse who had formerly attended her, and making a bequest of $500 to Mrs. Pfeil. In less than a month and a half afterward she executed a second codicil to her will, by which she bequeathed to Mrs. Pfeil property of the value of about $30,000. It was only because her attorney called her attention to the fact that it had been her brother's desire, as well as her own, that Warren have the land in question, that the devise of this land to Warren was not revoked by that codicil and the land devised to Mrs. Pfeil, and after that codicil had been executed Mrs. Pfeil told Dr. Turner, the attending physician, that Eliza had left all of her property to her (Mrs. Pfeil) except the Warren farm, and that there could be nothing done about that farm. Four days after this second codicil had been executed by Eliza she executed the deed in question, which had been drafted by a banker with whom she had done no business and had no acquaintance but who was the cashier of the bank with whom Mrs. Pfeil did business. Before this deed was executed Eliza did not consult with the attorney who had drawn her will and the codicils thereto and who had been the legal adviser of her and her brother for many years, nor did she consult with any other person who had been her friend prior to the time she was removed to Mrs. Pfeil's home. The execution of the deed was kept a secret from her attorney, her business agent and her friends until after her death. Mrs. Pfeil was well paid for the services she rendered Eliza, and in addition to such compensation, in the short period of four months, while Eliza was in her exclusive care, she obtained by the codicils to the will and by the deed in question property of the value of over $40,000. It also appears that during the time Eliza was in the home of Mrs. Pfeil, dependent upon her for care and attention, Eliza's attitude toward those whom she formerly trusted and relied upon changed. She no longer

treated them with the same cordiality and trust as before but her attitude toward them became cool. She did trust in Mrs. Pfeil. She was indisposed to sign a receipt for money from the estate of her brother, William, when it was presented to her by the man she had made her business agent, and it was not until Mrs. Pfeil urged her to sign it that she did so. It also appears that during the period that she was at Mrs. Pfeil's home the latter manifested an interest in her property entirely out of keeping with her position as a hired nurse. She wrote to a tenant in the house formerly occupied by Eliza and her brother asking the tenant to pay for a stove in the house, and it appeared that the stove had been given by Eliza to the tenant. She also wrote to Eliza's business agent, Morrison, asking him to send Eliza $25. The money was sent to her, and shortly thereafter she returned the money to Morrison and said that Eliza did not need it and that she wanted to give money to every child that came into the house.

The facts above mentioned lead irresistibly to the conclusion that prior to the time of the execution of the deed in question in this case Mrs. Pfeil had acquired the complete confidence of the grantor, and that because of that confidence she had great influence over the mental processes of the grantor, who because of her illness and physical condition was an easy subject of domination. A fiduciary relationship is not limited to cases of trustee and *cestui que trust,* guardian and ward, attorney and client, and other recognized legal relationships, but extends to every possible case in which there is confidence reposed on one side and a resulting superiority and domination on the other. The origin of the confidence may be moral, social, domestic or merely personal. If the confidence in fact exists and is reposed by one party and accepted by the other the relation is fiduciary and equity will regard dealings between the parties according to the rules which apply to such relation. (*McCord* v. *Roberts,* 334 Ill. 233; *Higgins* v. *Chicago Title*

*and Trust Co.* 312 id. 11.) Where a deed is made by the confiding party in a fiduciary relationship to the one in a position of influence over him the presumption is indulged that the deed was procured by undue influence, and the burden is cast upon the grantee to prove that the transaction was fair and that there was no undue influence to procure the conveyance. (*McCord* v. *Roberts, supra; Feeney* v. *Runyan,* 316 Ill. 246; *Mors* v. *Peterson,* 261 id. 532; *Hensan* v. *Cooksey,* 237 id. 620; *Dowie* v. *Driscoll,* 203 id. 480.) "The rule is, where a person enfeebled in mind by disease or old age is so placed as to be likely to be subjected to the influence of another and makes a voluntary disposition of property in favor of that person, the courts require proof of the fact that the donor understood the nature of the act and that it was not done through the influence of the donee." *Sands* v. *Sands,* 112 Ill. 225; *Berry* v. *Egan,* 291 id. 377.

A careful consideration of the evidence in this record shows clearly and conclusively that there was a fiduciary relationship between the grantor, Eliza F. Sampson, and Ida Pfeil at the time of the execution of the deed in question; that the grantor reposed confidence in the grantee, who because of that confidence was in a position of dominance over the grantor. Since a fiduciary relationship existed when the deed was executed the grantee had the burden of showing that the deed was not procured through her influence over the grantor, and this burden she has not discharged. We are not unmindful of the fact that the chancellor heard and saw the witnesses testify and that his decree should not be disturbed unless manifestly against the weight of the evidence, but we are convinced, after carefully weighing all the evidence, that the decree of the circuit court is manifestly against the evidence in this record.

The decree of the circuit court is reversed and the cause remanded to that court, with directions to enter a decree in accordance with the prayer of appellants' bill.

*Reversed and remanded, with directions.*