People of the State of Illinois ex rel. Oscar Nelson, Auditor of Public Accounts of the State of Illinois, Plaintiff, v. Central Manufacturing District Bank, Defendant.

Augusta Oglesby, Executrix of Last Will and Testament of John G. Oglesby, Deceased, Appellant, v. Charles H. Albers et al., Appellees.

### Gen. No. 41,180.

Opinion filed June 19, 1940.

CHARLES C. LeFORGEE and WILLIAM M. RICE, both of Decatur, for appellant.

HEALY & REID, of Chicago, for certain appellee.

MILLER, GORHAM, WESTCOTT & ADAMS, of Chicago, for certain other appellees.

MR. JUSTICE BURKE delivered the opinion of the court.

On June 24, 1932, the auditor of public accounts closed the Central Manufacturing District Bank (a state bank having its principal place of business at 1112 West 35th street, Chicago), as an insolvent association, and appointed a receiver therefor. On August 6, 1932, an order for the dissolution of the bank was entered in the circuit court of Cook county, which order also confirmed and approved the appointment of the receiver. On May 18, 1933, pursuant to leave of court, John J. Oglesby, filed his intervening petition in chancery against the receiver, setting forth his claim in the sum of $105,750 and accrued interest thereon, praying that the claim be allowed by the court as a preference, that the receiver

be ordered to pay the claim from the assets of the bank, and that he be granted such other relief as might be just and proper. The receiver filed his answer and the cause was referred to a master in chancery. On August 7, 1935, a depositors' committee filed its petition for leave to intervene and defend against the claim. On December 12, 1938, pursuant to leave of court, Oglesby filed his amended intervening petition and the receiver filed his answer thereto. The matter was heard by the master upon the amended intervening petition and the answer thereto. After the hearing before the master, but prior to the issuance of the report, John G. Oglesby departed this life, and upon the suggestion of his death to the court, Augusta Oglesby, executrix of the last will and testament of John G. Oglesby, deceased, appellant herein, was substituted as intervening petitioner. On December 12, 1938, the master filed his report, recommending that the amended intervening petition be dismissed for want of equity, and that the costs be assessed against the petitioner. The executrix filed her objections, which were overruled by the master. The chancellor entered an order allowing the objections to stand as exceptions. On December 12, 1939, the chancellor overruled the exceptions and dismissed the amended petition for want of equity at petitioner's cost, to reverse which this appeal is prosecuted.

Appellant's theory of the case is that the bank, over a period of about 10 years, acquired for and sold to John G. Oglesby numerous and divers notes and bonds secured by Chicago real estate, and that at the present time appellant holds such bonds and notes of a face value in excess of $100,000; that in connection with the sale of such securities to Oglesby the said bank intentionally concealed certain material facts and made certain wrongful representations to Oglesby, which vitiated the transactions and gave Oglesby the right, power and authority to rescind the said transactions and receive back the money he had paid to said bank for the

securities; that Oglesby did rescind said transactions and admittedly tendered said securities to said bank and to the receiver for said bank; that apart from the actual wrongful concealments the evidence shows that a fiduciary relationship existed between the Central Manufacturing District Bank and John G. Oglesby which relationship was created by the representations and conduct of said bank; that said bank violated the confidence which it had inspired and which it well knew that Oglesby reposed in it; that said bank concealed and suppressed numerous and divers material facts from Oglesby; that said bank admittedly acted as agent and broker in buying securities for him, when in fact and without Oglesby's knowledge, the bank was acting for itself and for numerous and divers issuers and borrowers from the bank, and that out of said transactions the bank was receiving profits and benefits without Oglesby's knowledge other and in excess of commissions as broker's fees; that because of the bank's conduct, its dual agency, and the subsequent abuse of this confidence, the bank secured and now holds the money Oglesby paid to it for said bonds as a constructive trustee; that appellant is, therefore, entitled to recover the sums paid, together with interest thereon. Appellees' theory of the case, as stated in appellant's brief, is that the bank's conduct was not fraudulent and that no fiduciary relation existed between the said bank and Oglesby; that the bank did not act as agent in purchasing securities for him, but that the relation between Oglesby and the bank was simply that of buyer and seller, and that the evidence in this case does not justify a holding that the bank holds or ever held the funds as constructive trustee.

Appellant states the law relative to fraud, constructive trust and fiduciary relationships. A constructive trust may be defined as the device used by chancery to compel one who unfairly holds money or property to convey such money or property to another to whom it

justly belongs. When a court of equity finds a defendant is holding money or property which it acquired by unjust, unconscionable or unlawful means, it will raise a trust and take such interest from the defendant and vest it in the wronged party. Any transaction may be the basis for creating a constructive trust where for any reason the defendant holds funds which in equity and good conscience should be possessed by the plaintiff. In the case of *Warren v. Pfeil,* 346 Ill. 344, at p. 360, our Supreme Court said: ''A fiduciary relationship is not limited to cases of trustee and *cestui que trust,* guardian and ward, attorney and client, and other recognized legal relationships, but extends to every possible case in which there is confidence reposed on one side and a resulting superiority and domination on the other. The origin of the confidence may be moral, social, domestic or merely personal. If the confidence in fact exists and is reposed by one party and accepted by the other the relation is fiduciary and equity will regard dealings between the parties according to the rules which apply to such relation.'' Appellant supports his statements as to the law governing the case by ample authority. Appellees do not challenge the statement of the law as set out in appellant's brief. They assert that the issue is as to whether there was a fiduciary relationship giving rise to a constructive trust. We agree with appellees that in order to determine the proposition we must examine the facts.

The master found that the bank did not act as an investment agent for petitioner; that there was no fiduciary relationship, and that the relationship was that of seller and purchaser; that petitioner knew that the bank was an underwriter for securities and was deriving profit from the sale thereof. The master also found that Oglesby was in no different position than were thousands of other persons who bought securities from hundreds of banks. Oglesby was a farmer by occupation, though in the past he had held the positions

of Governor's private secretary, legislator and lieuten-
ant governor. He had never lived nor been engaged in
any business activities in Chicago, and he had never at
any time maintained a deposit, nor been a client or
customer of the bank. Oglesby was and had been for
a number of years a personal, political and social friend
and associate of David E. Shanahan, a director of the
bank. Mr. Shanahan later became chairman of the
board of the bank, and was at all times a controlling
factor in its affairs. During a conversation between
Shanahan and Oglesby in 1922, Shanahan urged Oglesby
to make investments through the bank, and further
urged Oglesby that if he had any money to invest he
would do well to get in touch with Frank L. Webb, an
officer of the bank, and that Webb and the bank would
take full charge of the matter for him. Oglesby did
not at that time know the bank, nor did he know any of
its officers. Thereafter Oglesby telephoned Webb, who
was the cashier, and told him what Shanahan had said.
Oglesby testified that Webb then told Oglesby that he
would be very glad to buy securities for him, that he
realized that he (Oglesby) knew nothing whatever about
the values of Chicago real estate, but that he (Webb)
would take full charge of whatever money Oglesby had
to invest, and that Oglesby would be assured that he
(Webb) would buy only safe and sound securities for
him. Oglesby testified that he believed and completely
relied upon the representations of Webb and Shanahan,
and thereafter a great many investments were made.
The usual procedure for making these investments was
as follows: Oglesby, who lived at Elkhart, Logan county,
Illinois, would contact Webb, usually by telephone but
sometimes by letter, advising Webb how much money
he had to invest. Thereafter, Webb would advise
Oglesby what securities he had purchased for him and
the price at which they had been secured, and Oglesby
would thereupon send his check payable either to the
bank or to Webb. Occasionally the bank would write

Oglesby recommending one or more issues to him and asking him if he had a preference, and Oglesby would reply by 'phone or letter advising the bank to purchase some or all of such recommended bonds, or if he had no funds to invest, he advised them that he did not wish to purchase such bonds. As to a great many of the securities so purchased by Oglesby, the bank gave Oglesby written agreements, promising to repurchase from Oglesby the securities purchased for him at his option at par, plus accrued interest. On all occasions where Oglesby requested such agreements from the bank, they were given to him, and finally in November, 1929, the bank wrote Oglesby advising him that it would repurchase at 99, plus accrued interest, any mortgage purchased by him. On April 5, 1932, Oglesby wrote to the bank that ''in conformity with your repurchase letter to me dated November 12, 1929, I hereby present to you for such repurchase at 99 and accrued interest to date of April 11, 1932, the following mortgages purchased on your bank, . . . I tender these bonds because I am in need of funds. Kindly advise me.'' The letter mentioned five mortgages. Neither the bank nor its officers replied to the letter and on May 31, 1932, Oglesby again wrote to the bank as follows:

''Dear Mr. Webb: . . . I have purchased from your bank in the past many bonds which carry a repurchase agreement of your bank that on such and such a time these bonds will be repurchased by your bank at par and accrued interest. This was and is part of the original contract when you sold the bonds to me.

''I notice that you say you feel proud of the record of your investments with me. I am glad you do so. Do you mean that because in the natural transaction of business when you have sold bonds to me making your underwriting fees and your commission thereon, and I paying you full price for same, that when the bonds mature and are due that I should feel that you have granted me a favor, if they are paid? And, remember,

that you are the only investment house with which I have transacted business that has refused at all times to allow me the usual bank director's concession, and, further, that none of your bonds carry prepayment of the normal tax.'' The bank did not reply in writing to this second letter but Webb telephoned Oglesby and asked if he and Mr. Hoebel, another official of the bank, might come down to see him. Thereafter, on June 8, 1932, Webb and Hoebel came to Elkhart and talked to Oglesby for four hours. Oglesby testified that these officers did not disclose to him the part the bank really had played in the transactions, nor did they advise him of the then financial interest of the bank in the bonds. He further testified that at that time Webb and Hoebel went over all of the investments with him and told him the investments were safe and assured him they would be taken up by the bank under the repurchase agreements, that he need not worry as the bank would take care of it; that they told him they would take the matter up with the board of directors as soon as they returned to Chicago, and that if he would wait a few days he would receive his check. He also stated that during this conversation he told these officers that he had relied upon them and that he thought it strange that they had not answered his letters, and that he had made up his mind to communicate with the president of the bank; that thereupon Webb and Hoebel again assured him that he need not worry, that they had been representing him fully, and that the securities were all in good shape and would be taken over by the bank. Shortly thereafter the bank was closed by the State auditor and a receiver appointed. The securities were tendered to the bank before it was closed and later to the receiver, and the tender was in each case refused. Appellant contends that it is clear from the evidence that Oglesby did not select or choose the securities supposedly purchased for him by the bank; that they were selected by the officers of the bank, and that in most instances he first knew

of the transactions when the bank advised him they had purchased these securities for him; that there were exceptional instances in which the bank selected two or more securities, limited always to those the bank had on hand in its own portfolio, and in substance asked him to express a preference as to those one or two securities on the submitted list. Appellant also asserts that the evidence shows that the bank did not at any time purchase securities for Oglesby in the broad and unrestricted field of investments; that all of the securities acquired by the bank for him were within a limited and restricted field and were either securities where the bank owned the entire issue outright, or were securities which the bank was engaged in marketing for some mortgagor or borrower from the bank; that the interest of the bank in the securities turned over to him was not really a brokerage commission, but was in fact the profit arising out of transactions originating in the bank for the purpose of securing profits as promoter, both in creating the loans and distributing the bonds it so created; that neither the bank nor its officers ever informed Oglesby it was selling him bonds which the bank owned, or bonds in which it was acting for the borrower and marketing the bonds for such borrower and receiving the profits and emoluments for representing both the buyer and the seller; that in fact the bank and its officers repeatedly assured Oglesby that it represented him and him alone, and that he had no knowledge of the dual activities of the bank.

The record discloses that with respect to bonds, such as were subsequently acquired by Oglesby, the practice was that when the bank decided to make a real estate or construction loan, the bank advanced the total sum to the borrower and opened an account with respect to each issue separately under the general caption ''Real Estate Loans'' or ''Real Estate Bonds and Mortgages,'' an asset account of the bank, and on this separate account for each issue, the initial acquisition by the bank

would be charged as a debit for the entire amount of the issue. The corresponding credits were the amounts made available to the debtor, the bank's profits (which were equivalent to $2\frac{1}{2}$ per cent to 5 per cent of the face of the total issue), and other expenses in connection with the making of a loan, such as printing and abstract charges. Everything in connection with the making of such loans was under the direction, management and supervision of the bank. The bank was the controlling force behind the entire procedure down to the smallest details, including supervision and approval of plans, appraisements, examination of abstracts and drafting of papers, with practically nothing left but for the mortgagor to sign and the investor to pay. The bank records disclose that after so acquiring the bonds the bank sold the bonds to various and sundry patrons, and that in many instances the bank would thereafter deal actively in such issues by repurchasing and then re-selling such bonds. These transactions were never at a loss to the bank. In at least four instances the bank repurchased such bonds from other investors and resold the same bonds to Oglesby at par. Appellant contends that the evidence shows that the bank in many instances made loans far in excess of the fair appraised market value of the property securing such loans, and there-after sold the bonds at par to Oglesby and others. Oglesby never made any investigation as to the securities or their values. He testified that he did not make any investigation for the reason that he had the positive unequivocal assurances that his money was safely invested, and that he could have no loss, and that the assurance was evidenced by the repurchase agreements given him by the bank. With regard to the interest on the various bonds and other securities sold to Oglesby, the bank kept two ledgers headed "Sundries Receivable" and "Sundries Payable." When the holder of an interest coupon presented such coupon for payment the bank would pay the interest due the holder

of the coupon regardless of whether or not the mortgagor had deposited the interest with the bank. If the mortgagor had already paid the interest to the bank the mortgagor's account in the "Sundries Payable" ledger would be credited and the payment would be charged against that credit. If the mortgagor had not paid the interest, the bank would nevertheless pay the interest to the holder of the coupon, and would then set up an account for the mortgagor in the "Sundries Receivable" ledger, and would debit such account with the amount of interest so paid. When and if the interest was actually paid by the mortgagor the bank would credit the mortgagor's account in the "Sundries Receivable" ledger. The bank records showed and Mr. Webb, the cashier, testified, that it was "the universal custom of the bank to pay the interest to the holders of interest coupons upon presentation whether or not the mortgagors were in default." The bank records also disclosed that in some instances the bank advanced instalments of principal as well as interest when the mortgagors were in default, and that in many instances the bank never recovered from the mortgagors this interest and principal so advanced and paid; that on numerous occasions the bank paid interest to Oglesby on bonds held by him when such interest had not been paid by the respective mortgagors, and when such mortgagors were in fact in default. The record also shows that the bank never informed Oglesby when it so advanced interest to him, that the mortgagors had not paid the interest and were in default, and that Oglesby had no knowledge when he received such interest payments that the mortgagors had not paid and were in default.

Appellant argues that the bank's acts and conduct in selling securities to Oglesby and thereafter concealing from him the fact that the mortgagors, or signors of the securities, were in default, by itself paying the interest due him, amounts to actionable fraud, and stand-

ing alone without any of the other facts in the case, entitles him to the relief prayed in the amended petition, and asks us to remember that Oglesby knew nothing about Chicago real estate values and that the bank knew his lack of such knowledge, and that the bank repeatedly told him that it was selling him only safe and sound securities and that he need not concern himself with or worry about the investments. Appellant declares that the purpose of the bank in concealing from Oglesby the various defaults was to disarm him into not only continuing to hold the securities he possessed, but to continue to invest additional large sums through the bank. Appellant concludes that the fact that when the bank was closed and Oglesby was holding securities which the bank had sold him with face values in excess of $100,000, showed that the "scheme" succeeded; that the concealment of the defaults lulled Oglesby into a sense of false security, and induced him not only to retain the securities already in his possession but to invest additional large sums; that he did not institute foreclosure or other proceedings as he would have had the right to do if the bank had not paid the interest, and that he did not request the bank to take up the securities at par plus accrued interest as it was at least morally bound to do under its written agreements with him. In support of her argument appellant cites *Continental Ins. Co. v. Mercadante,* 222 App. Div. 181, 225 N.Y.S. 488; *First Trust Co. of Lincoln v. Carlsen,* 129 Neb. 118, 261 N. W. 333; *Marshall & Ilsley Bank v. Guaranty Inv. Co.,* 213 Wis. 415, 250 N. W. 862.

Appellant advances the proposition that under the undisputed facts in the case a fiduciary relationship existed between the bank and Oglesby at the time of all the transactions in question. In support of this contention appellant calls our attention to the fact that in the first place Shanahan, a personal friend of Oglesby and a director of the bank, brought up the subject and solicited Oglesby to see Webb; that after the Shanahan

interview Webb and other officers and employees of the bank repeatedly told Oglesby that they knew he knew nothing whatsoever about investment values and Chicago real estate values, but that they would buy securities for him and would buy only securities that were perfectly safe and sound; that they would act for him and that he need not worry at all about the purchases they would make for him; that the manner in which the transactions were handled, considering Oglesby's known lack of knowledge of Chicago real estate and investment values, conclusively shows that Oglesby did repose complete confidence in the bank and its officials; also, that the repeated assurances given him by the bank officers that they were acting for him, and the other facts previously mentioned, shows conclusively that the bank knew of the confidence reposed and accepted it, and in fact did everything in its power to create and hold the confidence. Appellant also discusses the effect of the opinion in *Knass v. Madison & Kedzie State Bank*, 354 Ill. 554, filed December 22, 1933, rehearing denied February 8, 1934. She asserts that Mr. Oglesby was a layman and thought that the repurchase agreements were perfectly valid, and that the bank would repurchase the bonds from him in accordance with its written agreement with him so to do; that in fact the bank did repurchase securities from him in accordance with a number of such agreements; that while appellant is not seeking to enforce the repurchase agreements (having rescinded the entire transaction and tendered back the bonds and demanded the money from the receiver), nevertheless, the giving of the repurchase agreements, and the repurchasing by the bank in a number of instances in accordance with their terms, even though the repurchase agreements were ultra vires and void, accomplished as much in inspiring and holding the complete confidence of Oglesby as if the repurchase agreements had been perfectly valid and fully enforcible; that the repurchase agreements were

of the utmost importance, not because they are ultra vires and void instead of being fully enforcible, but because they were voluntarily issued by the bank to Oglesby as an inducement to him to rely upon such unauthorized instruments rather than upon the values of the properties securing the loans; that the agreements were a part of the bank's scheme, probably the most convincing part, which induced Oglesby to accept the assurances of the bank that his money was safely invested. Appellant also asks us to note that in addition to failing to disclose to her husband that the bank acted as an undisclosed principal in the issuance, underwriting and selling of the bonds it purportedly bought for him, profited by such issuance, underwriting and sale, as well as that it was acting as underwriting and sales agent for innumerable borrowers from the bank in the same transactions, the bank did in many instances repurchase at a discount bonds that it had previously underwritten and sold to other investors, and thereafter sold such repurchased bonds to him at par, without disclosing any of such facts to him. Appellant also states that the evidence shows that the amount of the loans made by the bank on particular properties was excessive from the standpoint of investment safety; that in some instances the loans were actually in excess of any fair appraised value of the premises, and that the conduct of the bank in making loans in excess of the fair appraised market value, thereafter representing to Oglesby that the loans were absolutely safe and sound and were well secured, constitutes actionable fraud, and is one of the many devices employed by the bank in inducing him to invest his money through the bank.

Appellant urges that it is apparent from the record that Oglesby did not know the following: 1. That the transactions out of which the securities arose originated in the bank and from beginning to end were managed and controlled exclusively by the bank. 2. That the bank received profits as promoters in the creation of these

securities as well as profits in the distribution of such securities and was the owner of all these securities. 3. That the values placed on the properties securing the notes and bonds were fixed by the bank and that in many cases the values of the properties were less than the face value of the securities issued. 4. That the bank advanced principal and interest instalments when the borrowers were in default and thereby concealed such defaults from Mr. Oglesby and other investors. 5. That the bank's representations to Oglesby that his money would be and was safely invested and that the bank was fully representing him were untrue. In conclusion appellant insists that she has shown by clear and convincing evidence that the bank was guilty of fraud in its dealings with her deceased husband; that a fiduciary relationship existed between them at the time of all the transactions in question; that appellees have not only failed to establish the fairness of the bank's dealings with him by clear and convincing evidence, but that on the contrary the evidence clearly discloses that the bank took unconscionable advantage of him and grossly abused the confidence so reposed; that the bank acted in a dual capacity for its own gain without disclosing such facts to him; that appellant has rescinded the contract and tendered back the property to the bank and to the receiver, and that the receiver holds the money which Oglesby paid to the bank as a constructive trustee for her.

In support of the decree, appellees maintain that in the original petition Oglesby based his claim on certain repurchase agreements. We have examined the petition, which is verified, and find that it is grounded on the repurchase agreements and not on charges of fraud and a fiduciary relationship giving rise to a constructive trust. While the case made by the original pleadings was being heard before the master, the Supreme Court rendered its decision in *Knass v. Madison & Kedzie State Bank, supra,* holding that repurchase

agreements by banks were ultra vires and void and against public policy. The petition for rehearing in that case was denied on February 8, 1934. On December 12, 1938, by leave of court, Oglesby filed his amended petition. The original petition was signed and sworn to by John G. Oglesby. The amended petition is based on a different theory than the original petition. It alleges that Oglesby did not have any knowledge that the bank owned or was in any way interested in the securities, prior to the closing of the bank. It also relies on a fiduciary relationship between the bank and Oglesby and the abuse of that relationship. It also relies on allegations of fraud and maintains that the facts alleged give rise to a constructive trust. Appellant replies that there is in fact no material inconsistency between the original and the amended petition, and that in any event it is an elementary rule that where, as here, an amended pleading is complete in itself and does not refer to or adopt a prior pleading, it supersedes it and the original pleading ceases to be a part of the record. Appellant also argues that the *Knass* case expressly recognizes the right of an investor to repudiate repurchase agreements where there has been actual fraud, or the abuse of a fiduciary relationship and to recover back the funds so acquired by the bank. We agree that as a matter of pleading, appellant is right in his contention that where an original pleading is amended by another pleading which is complete in itself, making the original pleading a part of the amended pleading, the original pleading, though it is still a part of the record, is superseded by the amended pleading and is no longer a part of plaintiff's averments. (*Maegerlein v. City of Chicago,* 237 Ill. 159.) We are of the opinion, however, that verified allegations may be introduced as admissions. The admissions of a party to a fact, no matter how made, may be given in evidence against him. Common law pleadings are admissible in evidence. (*Soaps v. Eichberg,* 42 Ill. App. 375.) It has been held that even though an

original answer has been withdrawn by leave of court and an amended answer filed, admissions in the first answer are competent evidence against the defendant filing the same. *People's Bank v. Wood,* 207 Ill. App. 602; *Parish v. Bainum,* 202 Ill. App. 563. In *Blakeslee v. Blakeslee,* 265 Ill. 48, p. 52, the court said:

"In the original answer filed by appellant she admitted she and appellee were tenants in common and that he was entitled to partition. Appellant contends that this answer is not entitled to be considered and ought not to prejudice her, because it was withdrawn by leave of the court. Appellant's position, in effect, is, that the answer should be treated as one wherein an admission has been improvidently made and the party making it has been relieved of its effect by order of the court. This would be true if the order were based upon an affidavit that the admission was made under a misapprehension or by mistake. (*Maher v. Bull,* 39 Ill. 531.) Appellant calls attention to the fact that it does not appear from the record that no such affidavit was filed. The record shows that on motion of the solicitor for appellant it was ordered she have leave to withdraw her original answer, file an amended answer instanter, and that the master hear the evidence and report his conclusions upon the issues made by the bill and amended answer. No order was made relieving the appellant from the admission made in her answer, and we would be unwarranted in assuming that the order made was based upon an affidavit that the admissions in the answer were improvidently made. If that were the fact it should be shown by the record." The record does not show that the order granting leave to file the amended petition was based upon an affidavit that the admissions therein were made under a misapprehension or by a mistake. The rule is recognized in section 35 of the Civil Practice Act (par. 159, ch. 110, Ill. Rev. Stat. 1939 [Jones Ill. Stats. Ann. 104.035]) which states that "verified allegations shall not constitute evidence

except by way of admission." We agree that appellant having filed an amended petition, has the right to have his case considered on the basis of that amended petition. However, it is the duty of the court in deciding the case also to consider any admissions made in the original verified petition. It is obvious that the reason why petitioner changed the theory of the case and also the statement of the underlying facts was because of the opinion in the *Knass* case. In a letter dated May 31, 1932, Oglesby wrote to the bank: "Do you mean that because in the natural transactions of business, when you have sold bonds to me, making your underwriting fees and your commissions, and I paying you full price for the same—remember that you are the only investment house with which I have transacted business that has refused at all times to allow me the usual bank director's commission." Here he shows knowledge that the bank was making underwriting fees and commissions and he also refers to the fact that the bank sold bonds to him. He also mentions that he is a bank director. In a letter dated August 1, 1922, 10 years before the bank closed, Oglesby indicated that he knew about the bank charging commissions, for he spoke of "such commission to your bank as will allow me 5½% instead of 6%." Appellees cite the following extracts from letters to support their argument that Oglesby never considered the bank as his agent and that he used his own judgment in the purchase of securities in spite of the repurchase agreements: September 7, 1924—"Have you any new issues or other suggestions for further investment." February 6, 1930—"Don't believe I'll take loan 1941." May 22, 1930—"Hoebel sent me Cook County Special Assessments. I don't want them as they are mixed up in tax muddle." May 23, 1930—"The warrants are Cook County and tied up in present tax muddle. Don't want them as interest will be delayed." April 23, 1932—"Sure your bonds have been good so far. Why not? You and your officers highly recom-

mend them. I bought of you heavily. You declined all concessions to me buying in lots and your bank the only one that did." Appellees also call attention to the wording of the repurchase agreement: "In consideration of your purchase from us we hereby agree to repurchase these bonds." "November 12, 1929—This bank highly recommends and agrees to repurchase any time before maturity at 99, and accrued interest to date, any mortgage purchased from us." In a letter of May 14, 1932, Oglesby demanded fulfillment of the repurchase agreements. Oglesby did not at any time turn over to the bank any money to invest at its discretion, nor did he at any time have a deposit in the bank. In each instance the bank submitted a list of securities, or presented data as to one or more securities, and then he made a selection therefrom and sent on the payment for the securities. In most cases he purchased only part of an issue.

Appellees insist that all the transactions were sale and purchase transactions and not investments by the bank as an agent for petitioner, and that in every instance he purchased the security. They also contend that in each instance payment was only made on delivery, and that Oglesby was in no different position than were thousands of people who bought securities from banks and investment houses. We have carefully considered the evidence and the arguments of the parties and the cases cited, and are convinced that the appellees are right in their contentions. We are of the opinion that the transactions between the bank and Oglesby involved a sale by the bank and a purchase by him, and that the bank was not his agent, and that a fiduciary relationship did not exist between him and the bank. The record clearly shows that he knew in each instance that he was making a purchase. The transactions took place at a time when values were on a higher basis than at the present time, and we must view the situation according to the values of real

estate and conditions existing at the time of the transactions. Oglesby was a bank director, intelligent, and a man of standing in the community. He sought to protect himself against bad investments by procuring the repurchase agreements. We agree that the repurchase agreement could not be used for the purpose of disarming him from being watchful of his interests, and the fact alone that the repurchase agreements were given would not prevent relief against fraud or the raising of a trust in an appropriate case. We are of the opinion, however, that the record in this case does not show fraud or a breach of trust. It is apparent that Oglesby knew that he was dealing with the bank as an investment house and that the bank was selling its own "underwritings." He also knew that the bank was getting commissions. In fact, in a letter he asked the bank to remember that it was the only investment house with which he had transacted business that had refused to allow him the usual bank director's commission.

We now pass to that part of the case dealing with the alleged action of the bank in concealing defaults in the payment of interest. Appellees argue that the evidence does not sustain the assertion that the bank ever concealed any defaults from Oglesby, or that he was ever misled or suffered any damage due to any payment of interest by the bank. We have read the cases cited by appellant but are of the opinion that they do not lend support to her argument. They do support the rule that where a trustee conceals or fails to give notice of a default, and the holder of the mortgage is thereby damaged, the trustee may be liable for such damages. They do not hold that the original deal could be rescinded because of the subsequent conduct of the trustee in concealing or failing to give notice of the default. It is not shown that Oglesby was delayed or that he failed to foreclose or take other suitable action because of the advancement of interest by the bank. The record does

show that he did not take any action because it was his position that it was the duty of the bank to live up to the repurchase agreements. In answer to the contention of appellant that as a result of the bank's concealment of the defaults Oglesby was lulled into a sense of false security which induced him to retain the bonds he had bought and to buy others, let us look into the facts. The practice of the bank was to pay interest coupons whether or not the interest had been received from the mortgagor. In some accounts the items for collection were presented and paid by the bank before the mortgagor had paid the money, in which case the items would be charged to his account until paid. Petitioner's witness, Murphey, gives the Zack Building as an illustration. Coupons for $210 fell due December 26, 1931. They were paid by the bank on January 6, 1932. The mortgagor paid the bank on January 25, 1932. The witness further testified that sometimes the borrowers would pay the money within a few days or a few weeks after maturity, and in other cases would never pay the interest, and when the bank closed there were substantial amounts owing to the bank by reason of such advances. This statement by the witness was general. With respect to Murphey's testimony as to the specific securities held by petitioner, there are 10 separate items. These do not constitute all of the securities bought from the bank by petitioner. As to only 4 of these is there testimony as to advancements of interest by the bank. There is no evidence of such advancements as to the other 6, or as to any of petitioner's other securities. Hence, there are only 4 to which appellant's contention could possibly apply. As to these 4, no injury or damage is shown. In 2 of the 4 the advancements were repaid by the mortgagor. We are satisfied that the evidence does not sustain appellant's contention that Oglesby was lulled into a sense of false security by reason of any concealment by the bank, and thereby induced to retain bonds he had pur-

chased and to buy others. We also agree with the contention of appellees that there was no fiduciary relationship between the bank and Oglesby. The securities were first acquired with the bank's own money. They were bought, not for the purpose of selling them to Oglesby, but for the purpose of investing the bank's money and then offering them for sale to the public. The good faith of the bank in loaning its money and taking the security is not questioned. It has not been shown that any of the mortgages or bonds were poorly secured when the values at the time the loans were made, are considered. When the securities were acquired by the bank and became its property they were offered for sale to the public. Lists were sent to customers and others, and from these lists customers chose. Oglesby bought the same as other customers did. In many instances he bought only part of an issue. The balance was sold to other customers or retained by the bank. It cannot be successfully contended that the fact that Shanahan solicited the patronage of Oglesby, established a confidential relationship. As pointed out by appellees, thousands of persons have been solicited and have opened up accounts in banks on the assurance of bank officials that the deposits would be safe, but no court has held that because of such solicitation or assurance any agency or confidential relation existed, or that a constructive trust arose. Our courts have uniformly held that the relationship was that of debtor and creditor. It is a matter of common knowledge that part of the business of banks is the loaning of money on real estate and charging commissions on the loans; that these securities were then offered for sale and sold; that buyers were solicited and told that the securities were good and safe. In the instant case the loans were likewise made in the usual course of business after due investigation. We are of the opinion that at the time the respective securities were sold to Oglesby, the bank officials believed them to be safe.

After a thorough consideration of the case, we are convinced that in effect petitioner is attempting by indirection to enforce the invalid repurchase agreements. For the reasons stated, the decree of the circuit court of Cook county is affirmed.

*Decree affirmed.*

Denis E. Sullivan, P. J., and Hebel, J., concur.