John Traff Building Construction Company, Appellant, v. Roy D. Keehn and Board of Education of City of Chicago, Appellees.

Gen. No. 41,161.

Heard in the second division of this court for the first district at the April term, 1940. Opinion filed May 14, 1942.

A. S. & E. W. Froehlich, of Chicago, for appellant.

Keehn, Keeley & McGuire, of Chicago, for appellee Roy D. Keehn.

Mr. Presiding Justice Scanlan delivered the opinion of the court.

The complaint prays to have cancelled and annulled a notice of attorney's lien served by defendant Keehn upon the Board of Education of the City of Chicago against a fund representing the unpaid balance of $47,851.91 due plaintiff from the Board upon the contract price for the doing of the mason and concrete work in the erection of the Verdi High School and that the entire balance be awarded to plaintiff. Defendant Keehn's amended answer and counterclaim prays: "(1) That the court enter a decree herein finding the amount to which this defendant is entitled out of the funds now in the hands of the Board of Education owing to the plaintiff . . . . (2) That as a part of such decree, the Board . . . be required and directed to pay to this defendant the amount which this court finds this defendant is entitled to, out of the balance of moneys remaining in its hands due to plaintiff . . . ." The cause was heard by the court and a decree was

entered denying the prayer of the complaint and awarding Keehn an attorney's lien upon the fund for the full amount of his claim, $15,976.05, and ordering the Board of Education to pay that amount to him out of the unpaid balance due plaintiff. The Board of Education, hereinafter called the Board, is a mere stakeholder and has not filed a brief in this court. Defendant Keehn will hereafter be referred to as defendant.

Plaintiff states that certain parts of the pleadings are important as in the nature of admissions by defendant because the trial court, over plaintiff's objections, permitted defendant to twice amend his sworn answer without any showing of mistake, inadvertence, or other excuse. The first of the amendments was filed during the trial, and the second, after the court had decided the case and directed defendant to prepare a decree.

John Traff Building Construction Company, a corporation, plaintiff, is the assignee of John Traff, a contractor who had been engaged in the construction business in Chicago for many years. On February 25, 1931, Traff entered into a written contract with the Board to do the masonry and concrete work in the construction of the Verdi Junior High School, for $410,600, payable in installments aggregating eighty-five per cent of the contract price during the progress of the work. By the summer of 1931 Traff had built the foundation, the first floor, and the frame work for the second floor of the school. Then the Board, faced with an empty treasury, ordered Traff, as well as all of the contractors who were engaged in work upon eleven schools then under construction, to cease work, and no work was thereafter done upon the Verdi school until the latter part of 1937. Over one hundred contractors were engaged in the construction of the eleven schools. Defendant is a lawyer, and in June or July, 1932, George Getshaw (now deceased) and Ray Berry called upon him and stated the situation of the

contractors. Defendant knew them prior to that time. Defendant testified that upon his recommendation the contractors authorized him to make a demand upon the Board that the work be continued and to notify the Board that the contractors would report for work on the buildings on the following Tuesday; that "my point was to try to create a breach by the Board of Education, which I could construe as a legal breach of a contract"; that he went before the Board and demanded that the contractors be allowed to proceed with the work and that the Board pay them for the work; that the Board asked for delay so that an agreement might be reached as to how the work should proceed, and "it was suggested there might be three methods, one, an outright cancellation of the contract; second, an extension of the contract, and, third, a completion of the buildings"; that the Board refused to consider the third, "because they couldn't pay"; that the Board finally concluded that there would be no advantage to it in considering the cancellation method. Defendant recommended to Getshaw and Berry that an organization be formed among the contractors for the purpose of having unified action on their part, and an association, composed of practically all of the contractors, was formed to protect their interests. Getshaw became chairman of the association, and Berry, treasurer. Meetings of the contractors were held during the summer months of 1932. In July or August, 1932, a resolution was passed authorizing Getshaw and Berry to call upon defendant, which they did. Defendant told them he would agree to act in a preliminary way without charge until he could familiarize himself with the situation and determine what could be done, but with the understanding that if he accepted the employment it would be upon the basis of a retainer and a percentage arrangement. Defendant stated to Getshaw and Berry the terms upon which he would undertake to represent the contractors, and at a meeting of the contractors on July 29, 1932, Getshaw stated defendant's terms. On

August 12, 1932, Getshaw and Berry sent to each contractor a letter that stated defendant's offer. The essential paragraphs of the letter are:

". . . we secured from him [Keehn] an informal proposition to handle the work on the following basis: each contractor who is connected with this group is to pay him a retainer fee of $100.00 which is to cover the contractor's only obligation to Mr. Keehn with the following exceptions.

"If the contractor wishes the attorney to collect damages on a contract if it is canceled and anticipated profit on a contract not installed, the attorney wants 15% of the amount of damages collected and 5% of the amount of profit collected. The damages are not to be construed as labor and materials manufactured or installed. In the event of extension of contract, and contractor wishes to secure damages for delays, etc., the attorney wants 15% of the amount collected."

Late in August Getshaw and Berry asked defendant for a written confirmation of the terms of employment which he had authorized them to present to the association, and on September 1, 1932, defendant sent to Berry the following letter:

"Replying to your inquiry regarding the arrangement concerning retainers in the matter of the contracts with the Board of Education, the understanding is that each contractor is to pay a $100 fee as a retainer. This applies to all but a few contractors having very small contracts, who are to pay a less amount. This feature covers the retainer, and the additional fees to be paid later, as agreed upon with the contractors, is as follows:

"1. Cancellation of contract—15% of the amount of damages collected and 5% of the amount of profits collected. In this case damages are not to be construed as labor materials manufactured and installed.

"2. Extension of the contract—the fee will be 15% of the amount allowed for the extension of the contract, over and above the contract price itself."

On August 23, 1932, Traff employed defendant under the above agreement by paying him the retainer fee, $100. Prior to that date defendant and Traff were strangers. In 1933, through the efforts of defendant, all of the contracts *were extended for a period of one year* and damages were awarded to the contractors in consideration of the extension. Traff was awarded $20,104 damages, which were paid. Defendant protected his fees in connection with the services he rendered in obtaining the extension agreements with the Board by obtaining from each of the contractors an assignment of fifteen per cent of the damages allowed to them. The fifteen per cent, in the case of Traff, amounted to $3,015.60, which Traff paid to defendant. Defendant, under his agreement, was entitled to the fifteen per cent, and there was and is no controversy between the parties as to this extension matter. Early in 1937 the Board, after it obtained financial aid from the National Government, decided to complete the work upon the schools. The completion work upon nearly all of the schools was made possible by the financial aid extended to the Board by the Federal WPA; the Verdi High School was otherwise financed. A number of conferences were held between defendant and representatives of the Board with a view to the preparation of a form of completion agreement for the contractors to sign, and defendant discussed the matter with the contractors. Defendant and the Board finally agreed upon a draft of the form to be used, and a copy of the same was mailed to plaintiff by defendant with a request that plaintiff sign it, which he did. The document bears date of May 6, 1937. From 1934 on, building material costs, labor and wage scales, and subcontractors' demands had increased materially, and new items of expense, such as Retailers' Occupational taxes, social security and unemployment insurance taxes, had been imposed. The subcontractors were making demands for increased

compensation for the doing of their part of the uncompleted work. Defendant testified that practically everybody discussed the question of increased costs of labor and material; that the contractors told him that the wage rates and the prices of material had risen; that he was familar with that situation and knew when the rise started; that he told the contractors that he would draft a paragraph to cover the price increases of labor and material; ''I told them that I would draw a provision in this paper that would give them the increased rates of labor and material for finishing up the work—everything. I believed that under the terms of it [the document of May 6, 1937] they could recover all. I made a provision here for the payment of attorney's fees to me.'' The proposed agreement of May 6, 1937, required Traff to furnish a surety completion bond and the surety company refused to write the bond upon the ground, as stated by the manager of the company, that the agreement was very ambiguous in respect to the total amount of money that the contractor was to receive and that as the surety company interpreted the contract the cost to Traff to finish the Verdi building would be some $70,000 to $80,000 more than the total amount that the Board agreed to pay Traff; ''that was the reason assigned by my company for the refusal to write the bond.'' Traff thereupon called upon Christensen, the architect of the Board, and discussed with him the meaning of the proposed agreement of May 6, 1937. Christensen told Traff that the agreement did not provide for the payment of the increased costs and that the Board would not pay any increased costs. Christensen then wrote several letters to Traff emphasizing the said position of the Board. On August 19, 1937, Christensen wrote to Traff that any further discussion as to the interpretation of the document of May 6, 1937, would be ''a waste of time,'' that unless Traff furnished the Board with the required surety bond within forty-eight hours he, Christensen,

would lay the facts before the Board for "action which will permit the completion of the Verdi High School." Traff attempted to secure a surety bond from several other bond houses, but without success. He testified that he then talked to defendant a couple of times about the matter and told him that he was unable to secure a bond because the document of May 6, 1937, was not clear enough to show what extras he would obtain; that "that is what the bonding company went by"; that he told defendant that Christensen told him that they were going to advertise for bids and might give the work to somebody else; that defendant answered, "I don't care. I will collect from you anyhow." Traff then made a fruitless effort to get the subcontractors to agree to furnish their parts of the work without demanding increases. Plaintiff justifiably complains that the document of May 6, 1937, proved to be very detrimental to his interests. Defendant, in his amendment to his answer and counterclaim, "admits that the written proposal attached to plaintiff's complaint as Exhibit 'A' [the document of May 6, 1937] did not become operative at any time." The Board finally advertised for bids for the completion of the contract on the Verdi school. After Traff had obtained permission from Christensen to become a bidder, he submitted a bid in the sum of $384,980, less certain deductions for omissions, and accompanied the bid with a certified check for $11,549.40. He testified that upon the advice of defendant he included in his bid an item of fifteen per cent to represent attorney's fees for defendant. Eight or nine other contractors submitted bids to the Board. Traff's bid was the second lowest. All of the bids reflected the increased costs for the completion of the work and it is clear that the Board hesitated to award the bid to the lowest bidder because it feared it would be liable to Traff for breach of contract. It therefore entered into negotiations with Traff seeking to secure a reduction in the amount of his bid. Defend-

ant claims to have been instrumental in causing the Board to take this action. Traff claims that defendant had nothing to do with the matter. The negotiations appear to have been carried on between Traff and the Board, and during the negotiations Traff was consulting with his attorney, Mr. Froehlich. The Board refused to allow the item for attorney's fees and required Traff to submit "an itemization or breakdown of his bid," which he thereafter submitted. Defendant had nothing to do with the preparation of the "itemization." Representatives of the Board and Traff then held a conference in respect to the items in the "itemization." The Board finally eliminated the item of interest, which reduced Traff's bid to $106,507, and awarded Traff the contract, which was signed as of December 15, 1937. The bond furnished by Traff to the Board was written by the same surety company that had refused to furnish a bond for Traff under the proposed agreement of May 6, 1937. The contract of December 15, 1937, stipulates that plaintiff releases the Board from all claims for damages of every kind and nature. The greater part of Traff's bid represented subcontractors' demands for increased costs of completion, as well as some increased costs in each of the remaining items; also taxes and other new items of expense. The second amended answer of defendant avers, and the decree finds, that the contract price of $106,507 was wholly made up of amounts of additional costs of completing the work of construction of said Verdi Junior High School Building over the costs which prevailed in February, 1931. Plaintiff completed the work on the Verdi school under the contract of December 15, 1937. On March 28, 1938, defendant served a notice of attorney's lien upon the Board. On January 6, 1939, defendant wrote the following letter to Traff:

"Will you also please drop in and see me on the damages *and fees* under the supplemental agreement *so that we can determine* the amount due you or which

will be due you *and the amount to be paid to the attorney for fees under our supplemental agreement? As soon as we get this matter agreed upon,* I will release the Board so that the payments may be made. I understand that the Board ought to be in a position to make payments early in the year.

"Will you please call and make an appointment *so that we can sit down and agree on any disputed questions?"* (Italics ours.)

On January 11, 1939, Traff replied to this letter, as follows:

"I have your letter of January 6th regarding damages on the Verdi High School Building.

"I received an allowance of $20,104 as damages for one year. I understood that I should receive damages for at least two years. No part of this has been received as yet or will probably ever be received.

"In regard to the supplemental contract you are aware that I had to meet open competition with ten contractors and that when the bids were opened I was second low bidder. The Board of Education gave me the contract for a little less than the low figure. The supplemental agreement of $106,507 covers increased costs of construction due to increase in wage rates, material prices, sales tax, social security and unemployment taxes and other costs which did not exist or have increased since 1931. There was no damage fee figured by the other contractors. When getting my figure together with the Board I added 15% as attorneys fees to cover damages amounting to about $28,000.00. When presented to the Board they deducted the attorneys fees and also an item covering 6% interest on the unpaid balance.

"Mr. Keehn, I feel that I do not owe you a cent on the supplemental contract because your set up was not used and was of no help to me. If you want to collect 15% on the damages you will have to ask the Board to pay you direct, up and above the amount of my contract."

Plaintiff contends that defendant is not entitled to an attorney's lien in any amount upon the fund in question. While this contention has been very ably and exhaustively argued by plaintiff, in our view of this appeal it is not necessary for us to pass upon the contention.

Plaintiff further contends (a) that defendant did not negotiate the contract of December 15, 1937; and (b) even if he did negotiate it he had no contract of employment which gave him the right to compensation computed at fifteen per cent of $106,507.

When defendant was employed, in August, 1932, the country was in the depths of a great financial depression; building prices and costs were at their low point and so remained for several years. During 1935 and 1936 costs of labor and materials steadily rose and items of expense came into existence which were unknown in 1931; these items included social security taxes, payroll (unemployment) taxes, sales taxes, and increases in premiums for compensation and public liability insurance. Plaintiff had subcontracted substantial portions of the work under his contract and the subcontractors were demanding large increases in the event that they had to complete their parts of the work. It is undisputed that the increases to the subcontractors represented the largest part of the $106,507. Plaintiff testified that before defendant drafted the proposed agreement of May 6, 1937, he informed defendant that he could not finish the work on the school unless he should be allowed a substantial increase in the original contract price. Defendant testified that he, and everybody else, was familiar with the situation. That the proposed agreement did not properly protect Traff in the matter of increased costs cannot seriously be disputed, although defendant, in his testimony, states that it was his *understanding* that the surety company refused to furnish the bond because of Traff's financial irresponsibility. The testimony of the manager of the surety company completely re-

futes defendant's "understanding." Plaintiff accompanied his bid of September 28, 1937, with a certified check for $11,549.40 and when the contract of December 15, 1937, was executed the same surety company furnished the bond. Defendant admitted in his verified pleadings that the proposed agreement of May 6, 1937, never became operative and it is clear that it caused Traff great trouble, and threatened for a time to deprive him of the opportunity to complete the work on the school.

The parties have seen fit to discuss at some length the question as to whether or not the contract of December 15, 1937, resulted from defendant's efforts Plaintiff contends that it did not. Defendant contends that he represented and acted for Traff throughout the negotiations; that he recommended to the architect and the officers of the Board "the arrangement" which was afterward carried out resulting in the said contract After the failure of the proposed agreement of May 6, 1937, Traff consulted his own lawyer in reference to his negotiations with the Board. Traff testified that he never requested or employed defendant to negotiate with the Board in respect to the matter of getting the new contract; that he did not confer with defendant after September 10, 1937; that he had other counsel write the Board in his behalf. Defendant admits that he did not draft nor file Traff's bid; that he did not draft the itemization or breakdown bid submitted to the Board by Traff; that he first heard about it at the time of the execution of the agreement of December 15, 1937; that he never saw the itemized bid until it was introduced in court and that he was not present when it was discussed by the Board and Traff and items therein were eliminated. That defendant had no knowledge of the make-up of the breakdown bid and the discussions that led to the completion agreement is shown by the following: The complaint avers that the $106,507 did not represent damages to plain-

tiff for the Board's breach of the contract of February 25, 1931, but represented increased costs of construction over and above the cost of construction which formed the basis of the contract price under the contract of February 25, 1931, "namely, increased costs and demands of subcontractors of the plaintiff, costs of replacing forms and materials, increases in labor and wage scales, increases in prices of material, and new items of expense such as Retailer's Occupational taxes, social security taxes, unemployment insurance levies, and other items not in existence or contemplated at the time of the making of the original contract." Defendant, in his original and amended answers, denies the foregoing averments, but after the trial and decision of the case he filed a verified second amended answer wherein he avers: "That the additional sum of $106,507, to be paid to plaintiff as recited in the preceding paragraph and as provided in the supplemental agreement of December 15, 1937, . . . was wholly made up of amounts of additional or increased costs of completing the work of construction of said Verdi Junior High School Building under plaintiff's contract for such construction, over and in addition to the costs of construction prevailing at the time the contract for construction was made in February, 1931," and the decree so finds. Defendant testified that after it appeared that Traff was not the low bidder he went to Christensen to try and save the contract for Traff; that he stated to Christensen that as Traff had a contract with the Board already, "the thing to do was to pass a resolution of the Board and extend the original contract to include $106,000, I think it was, figures submitted in addition and let Traff go ahead with the work, which was agreed upon." Christensen was not called as a witness, although it appears that he was very friendly to defendant. Traff testified that after Christensen told him that they were going to advertise for bids and that he might give the work to somebody

else he told defendant what Christensen had said, to which defendant answered, "I don't care. I will collect from you anyhow." We find no denial by defendant of this testimony. The complaint avers that Traff's proposal of May 6, 1937, was never accepted by the Board. Defendant's verified original answer denies that the proposal was never accepted by the Board, but in his second amended answer he admits that the proposal was never accepted by the Board and that it did not become operative at any time. The complaint alleges and the proof shows that the Board finally determined to take bids in the open market for the completion of the Verdi High School and to let the contract to the lowest bidder. Defendant's answer denies this allegation *in toto*. The complaint alleges that Traff's bid was accepted as the lowest bid. The original answer admits this allegation, but the amendment to the answer denies it. Defendant's testimony and his verified original answer show such a lack of knowledge of the negotiations between Traff and the Board that led up to the agreement of December 15, 1937, that it is difficult to accord weight to his claim that he represented and acted for plaintiff throughout the negotiations. If we deemed it necessary to decide the instant question we would be forced to disagree with the finding in the decree that defendant "acted in behalf of plaintiff in all of the said matters and devoted much time, effort and services to securing the said adjustments of damages and arrangements for payment thereof to plaintiff, and therein, secured said adjustment of damages."

But assuming that defendant was active in the matter of negotiating that contract, and assuming, further, that he rendered all necessary legal services in connection with the matter, still the vital question to be determined is, Had he a right to compensation for his services computed at fifteen per cent of $106,507?

Defendant's letter of September 1, 1932, to Berry forms the basis of his claim against Traff. In defendant's verified original answer he alleges that Traff agreed to pay him "for his services in case of cancellation of the contract, '15% of the amount of damages collected, damages not to be considered as labor or materials, manufactured or installed,' and in case of extension of the contract, '15% of the amount allowed for the extension of the contract over and above the contract price itself' and in addition thereto agreed to pay to this defendant the sum of $100.00 as a retainer fee." That statement of the agreement is in strict accord with defendant's agreement in his letter of September 1, 1932. Defendant testified: "I am claiming under the original agreement which I had in the year 1932 plus subsequent agreements verifying or re-affirming it." He further stated, "I mean the original understanding which I confirmed in writing to Mr. Berry." It is perfectly plain that the agreement set out in defendant's letter to Berry did not contemplate such an agreement as the one of December 15, 1937, between Traff and the Board. The reason why a completion of the contract provision was not put in the letter of September 1 appears in the testimony of defendant wherein he states that he reported to a meeting of the contractors held prior to the agreement of September 1, 1932, that he had learned from the Board that because of its financial position it could not consider the completion of the work, "so, I reported the only thing I could see that was feasible at all, sound, and that would be *to negotiate on terms for extensions of the contracts until the Board could be in a position to proceed, and that in that event we should work out an agreement between us as to what compensation I should receive.*" Defendant further testified that he also reported to that meeting what his terms would be, and that he confirmed the said terms in his

letter of September 1, 1932. It must be noted that it was only when the National Government came to the aid of the Board in *1937* that the latter was in a position to even consider the completion of the schools.

However, at the close of defendant's direct testimoney he injected into the case a new claim, *viz.,* that he had an oral agreement with Traff as to his fee for services in connection with the agreement of December 15, 1937. Defendant testified that he had a discussion with Traff about the figures that went to make up the $106,000; that he told Traff he should include in the figures fifteen per cent attorney's fees. ''He reported back to me later he had put an item of fifteen per cent for attorney's fees and they struck it out. I then explained to him he couldn't expect them—I told him to include it in the figures. I didn't tell him to include it as the fifteen per cent attorney's fees, which he did, or at least he said he did. He said they said they could not allow outside attorney's fees; they had attorneys of their own. That was just before the resolution of the Board early in December. I told him specifically he was to pay fifteen per cent attorney's fees over and above the contract, the original contract, that he should prepare his figures so that would be included. In fact, I said, 'So you will be protected.' That is what I said. That fifteen per cent had been discussed from the very start. *He said I would be entitled to fifteen per cent, our understanding is: You are to get fifteen per cent of what I get. The Court: When did he tell you that? The Witness: That was the first time, when we first started. It was understood when I had talks with him. I can give you specific dates, October 26, 1937, November 10, 1937.''* On crossexamination defendant stated: ''I don't think that the matter that he [Traff] was going to pay me fifteen per cent on money that he had to pay subcontractors was discussed.'' Traff denies that he had any talks with defendant in the fall of 1937 in which he agreed to pay

him fifteen per cent of what he received in excess of the original contract price. After the decision of the cause defendant obtained leave to amend his verified original answer for the second time by striking out all references to damages for deferment or extension and including an averment that plaintiff in July or August, 1932, "agreed to pay this defendant for his services the sum of $100.00 as a retainer fee, and the further amount of fifteen per centum of any and all amounts thereafter paid by said Board of Education to plaintiff over and above the amount provided by plantiff's said original contract and referable to the said stopping by said Board of Education of work under said contract and to the damages to plaintiff resulting therefrom." The decree finds that there was such an agreement. Traff strenuously contends that defendant's testimony as to the alleged oral agreement was an afterthought and false, and he complains that defendant was allowed to withdraw admissions made under oath in the pleadings, without making any showing, and to shift his ground for recovery. Defendant answers this contention as follows: "If a modern defendant, becoming better informed during a trial, changes a denial into an admission of plaintiff's allegations, on what barnacle encrusted relic of outmoded doctrines can plaintiff base objection thereto?" An admission in a sworn answer is not relieved against merely by filing an amendment withdrawing it. (See *People ex rel. Nelson v. Central Mfg. Dist. Bank,* 306 Ill. App. 15, 30, and cases cited therein.) That the verified original answer of defendant was not based upon the alleged oral agreement is not disputed. Counsel for Traff argues that defendant was an able, experienced lawyer, and knew the facts as to his claim when he filed the verified original answer. As we view it there is written evidence that proves conclusively that defendant's testimony as to the alleged oral agreement is not entitled to any credence. On January 6, 1939, nearly

fourteen months after the execution of the contract of December 15, 1937, defendant wrote a self-serving letter to Traff, which we have heretofore incorporated in this opinion. If Traff made the oral agreement that defendant claims he did, then on January 6, 1939, defendant was entitled to fifteen per cent of $106,507, yet, in that letter defendant asks Traff to drop in and see him on the fees under the supplemental agreement, "so that we can determine . . . the amount to be paid to the attorney for fees under our supplemental agreement," and "As soon as we get this matter agreed upon, I will release the Board so that the payments may be made. . . . Will you please call and make an appointment so that we can sit down and agree on any disputed questions?" We are constrained to believe that if Traff had made the alleged oral agreement defendant would never have written this letter, and his verified original answer would not have been absolutely silent as to the oral agreement. While defendant was upon the stand, but before he had testified to the alleged oral agreement, the following occurred: The court addressing counsel for defendant: "After all, don't you depend on the matter of contract, on the question of contingent fees here? Mr. Keeley: That is what I thought about, your Honor. My thought about it is that we are suing here—The Court: *Well, if there was the question of quantum meruit here, it would be a different thing.* Mr. Keeley: We are not in on that basis at all." The thought expressed by the court that the defendant, to recover, would have to rely upon the *quantum meruit* for any services he might have rendered in connection with the agreement of December 15, 1937, was answered by the testimony as to the alleged oral agreement.

In our judgment it would be highly inequitable to allow the instant decree to stand. The $106,507 that Traff received was not a payment of damages for the breach of the original contract by the Board. Indeed,

the agreement stipulates that plaintiff releases all claims for damages of every nature. It maks no difference whether the agreement of December 15, 1937, be considered a new agreement or a supplementary agreement, the $106,507 represented the consideration for a new agreement by Traff to do work in the future, work that he was then not legally obliged to do, which work entailed costs and expenses upon him that were not in the contemplation of the parties at the time of the making of the original contract between Traff and the Board. The said sum did not go into Traff's pocket. In receiving it he was akin to a conduit, through which payments were made to governmental authorities, subcontractors, laborers, insurance companies, and others, in order that the Board might get the work done. The amazing changes in the conditions between 1931 and 1937 made such action necessary, and yet defendant was awarded fifteen per cent upon numerous items that Traff was compelled to pay out to others. If defendant considers that he rendered services to Traff in the matter of the contract of December 15 he has the right to file a suit at law against plaintiff for fees based upon the *quantum meruit*. His counsel refused to rely upon the *quantum meruit* in the instant case.

The judgment decree of the superior court of Cook county is reversed and the cause is remanded with directions to the trial court to enter a decree in conformity with the prayer of plaintiff's complaint.

*Judgment reversed; and cause remanded with directions.*

SULLIVAN and FRIEND, JJ., concur.